ACCEPTED
03-14-00718-CV
4682548
THIRD COURT OF APPEALS
AUSTIN, TEXAS
3/27/2015 8:34:20 PM
JEFFREY D. KYLE
CLERK

# No. 03-14-00718-CV

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
3/27/2015 8:34:20 PM
JEFFREY D. KYLE
Clerk

IN THE THIRD COURT OF APPEALS
AUSTIN, TEXAS

CITIZENS AGAINST THE LANDFILL IN HEMPSTEAD; MICHAEL MCCALL, WAYNE KNOX; AND THE CITY OF HEMPSTEAD,

Appellants,

v.

TEXAS COMMISSION ON ENVIRONMENTAL QUALITY AND PINTAIL LANDFILL, LLC,

Appellees.

On Appeal from the 201st Judicial District Court, Travis County
Honorable Scott H. Jenkins, Presiding

## BRIEF OF APPELLEE PINTAIL LANDFILL, LLC

MCELROY, SULLIVAN, MILLER, WEBER & OLMSTEAD, L.L.P.
Brent W. Ryan
State Bar No. 17469475
P.O. Box 12127
Austin, TX 78711
512-327-8111
512-327-6566 (fax)
bryan@msmtx.com

LAW OFFICE OF MICHAEL S. TRUESDALE, PLLC
Michael S. Truesdale
State Bar No. 00791825
801 West Avenue, Suite 201
Austin, TX 78701
512-482-8671
866-847-8719 (fax)
mike@truesdalelaw.com

COUNSEL FOR APPELLEE PINTAIL LANDFILL, LLC

**STATEMENT REGARDING THE RECORD ON APPEAL**

The clerk's record consists of a single volume, cited as "CR page #", a supplemental clerk's record filed on January 26, 2015, cited as "1Supp.CR page #", and a supplemental clerk's record filed on February 11, 2015, cited as "2Supp.CR page #".

The reporter's record consists of a single volume that memorializes the parties' joint offer of an exhibit referenced as the "administrative record". That exhibit consists of two boxes containing seventy documents divided into eleven volumes, cited herein as "Vol# A.R. Ex#". The reporter's record was filed electronically, but a paper certified copy of the original administrative record was transmitted to the clerk of this Court.

# TABLE OF CONTENTS

STATEMENT REGARDING THE RECORD ON APPEAL ................................i

TABLE OF CONTENTS.................................................................ii

INDEX OF AUTHORITIES.............................................................iv

STATEMENT REGARDING ORAL ARGUMENT..............................vi

ISSUES PRESENTED....................................................................vi

1. Did the TCEQ have the discretion to approve Pintail's facility by way of a registration pursuant to Rule 330.9(b)(3) rather than requiring it to obtain a permit?  In following the registration process, did the TCEQ violate Appellants' due process rights by affording all process due thereunder but not the heightened process available in connection with permit proceedings? ......................................................vi

2. When neither statute nor agency rule prescribes any specific procedures for doing so, does the TCEQ have the discretion to choose when and how often to request that an applicant provide additional information deemed useful in processing an application? ......................................vi

INTRODUCTION .........................................................................1

STATEMENT OF FACTS ..............................................................3
A. What this appeal is not about.................................................3
B. An overview of the regulations governing the facility at issue ........4
C. Pintail's facility...............................................................5
D. Appellants' active participation in the registration process...........7
E. The application process.......................................................8
F. Subsequent challenges to the registration ...............................9
G. The district court appeal ....................................................10

SUMMARY OF ARGUMENT .......................................................10

ARGUMENTS AND AUTHORITIES................................................12
I. Standard of Review............................................................12
II. The TCEQ properly authorized Pintail's facility by way of a registration......13
A. TCEQ's registration of Pintail's facility fit within its broad regulatory discretion .......................................................14
B. Neither of the Rule 330.9 sections relied upon by Appellants demonstrate any error in the registration of Pintail's facility.........18
    1. Why Rule 330.9(b)(3) applies to Pintail's facility ................18
    2. Why Pintail did not have to invoke Rule 330.9(f) ................21

a. 330.9(f) does not apply to "all" new facilities, just those that meet all of it provisions ..................................................21

b. A transfer station facility may also store, separate, and process materials for recycling...................................................22

C. Due process issues do not justify disturbing TCEQ's approval of the registration application. ....................................................................................25

1. Appellants' due process arguments are derivative of their rule-based arguments – Appellants received all process to which they were entitled under the governing statutes and rules .............................25

2. Appellants' rights to a contested case hearing in connection with Pintail's application for a separate landfill permit are not undercut by TCEQ's approval of the transfer station by registration ...................26

3. The existence of any "property rights" does not morph the procedures that are otherwise authorized by law .....................................27

4. Authorization of the facility by registration rather than permit did not implicate any constitutionally protected rights ................................28

5. Absent a statutory or rule-based right to a hearing, the use of a registration process could not violate any due process rights ................28

III. The trial court correctly affirmed TCEQ's issuance of the registration over Appellants' "too many NODs" argument .........................................29

A. Appellants waived any complaint about the number of NODs .......................30

B. Texas law does not treat agency statements about internal procedures as equivalents to promulgated rules or statutes ....................................................30

1. No rules or statutes limit the TCEQ to issuing only 2 NODs ................30

2. TCEQ's so-called "policy statements" do not set any "2 NOD" limits..............................................................................................31

3. Informal TCEQ statements do not constrain the discretion of the agency to consider more, rather than less, information..........................33

C. Practical reasons demonstrate why the statements at issue were not binding as if they were rules or statutes ..........................................................34

CONCLUSION...................................................................................................36

PRAYER FOR RELIEF.......................................................................................37

CERTIFICATE OF SERVICE .............................................................................38

CERTIFICATE OF COMPLIANCE ....................................................................38

# INDEX OF AUTHORITIES

**Cases**

*Combs v. Entertainment Publications, Inc.*,
    292 S.W.3d 712 (Tex. App.—Austin 2009, no pet.) ..............................33, 34

*Fleetwood Community Home v. Bost*,
    110 S.W.3d 635 (Tex. App.—Austin 2003, no pet.) ....................................12

*Fredonia State Bank v. General American Life Ins. Co.*,
    881 S.W.2d 279 (Tex. 1994) ........................................................................30

*Heritage on the San Gabriel Homeowners Assoc. v. Tex.
    Comm'n on Envt'l Qual.*,
    393 S.W.3d 417 (Tex. App.—Austin, 2012, pet. denied) ......................12, 15

*McDaniel v. Texas Nat. Res. Conserv. Comm'n*,
    982 S.W.2d 650 (Tex. App.—Austin 1998, pet. denied) .................14, 16, 17

*Monk v. Huston*,
    340 F.3d 279 (5th Cir. 2003) ........................................................................27

*Southwestern Public Serv. Co. v. Public Util. Comm'n*,
    962 S.W.2d 207 (Tex. App.—Austin 1998, pet. denied) .............................12

*Starr County v. Starr Indus. Servs.*,
    584 S.W.2d 352 (Tex. Civ. App.—Austin, 1979, writ ref'd n.r.e.)..............33

**Statutes**

Tex. Health & Safety Code §§ 361.011 *et seq* ......................................................14
Tex. Health & Safety Code § 361.011(a)................................................................14
Tex. Health & Safety Code § 361.011(b) ...............................................................14
Tex. Health & Safety Code § 361.061 ....................................................................14
Tex. Health & Safety Code § 361.321 ....................................................................15
Tex. Water Code § 5.351 ........................................................................................15

## Rules

Tex. R. App. P. 9.4.................................................................................................39
Tex. R. App. P. 9.5.................................................................................................38
Tex. R. App. P. 25.1(e) ..........................................................................................38
Tex. R. App. P. 38.1(i) ...........................................................................................29

## Regulations

30 Tex. Admin. Code ch. 39 ...................................................................................15
30 Tex. Admin. Code ch. 50 ...................................................................................15
30 Tex. Admin. Code ch. 55 ...................................................................................15
30 Tex. Admin. Code ch 80 .....................................................................................15
30 Tex. Admin. Code § 312.13(b) ...........................................................................25
30 Tex. Admin. Code § 312.13(c) ...........................................................................25
30 Tex. Admin. Code §§ 328 *et seq.*.......................................................................4
30 Tex. Admin. Code § 328.1 ..................................................................................17
30 Tex. Admin. Code §328.2(3) ...............................................................................6
30 Tex. Admin. Code § 328.4(a) .....................................................................4, 5, 18
30 Tex. Admin. Code § 328.4(c) ...............................................................................4
30 Tex. Admin. Code § 328.4(d) .....................................................................5, 6, 18
30 Tex. Admin. Code § 330.11 ................................................................................15
30 Tex. Admin. Code §§ 330 *et seq*........................................................................4
30 Tex. Admin. Code § 330.13 ................................................................................15
30 Tex. Admin. Code § 330.003(117) .....................................................................24
30 Tex. Admin. Code § 330.3(122) .........................................................................17
30 Tex. Admin. Code § 330.3(157) .........................................................................18
30 Tex. Admin. Code § 330.3(33) .............................................................................4
30 Tex. Admin. Code § 330.5(a)(3).....................................................................18, 23
30 Tex. Admin. Code § 330.69 ................................................................................17
30 Tex. Admin. Code § 330.7 ..................................................................................15
30 Tex. Admin. Code § 330.9 ..................................................................................19
30 Tex. Admin. Code § 330.9(a) ..............................................................................20

## STATEMENT REGARDING ORAL ARGUMENT

This is not a complicated case. It does not raise questions regarding "health" or "the environment" as Appellants' statement insinuates. Rather, it presents straight-forward issues concerning the interpretation and application of agency rules and the discretion an agency has in construing and implementing its own rules. The issues have been briefed by able and well-respected counsel at the agency level, at the district court level, and now before this Court, and it is not likely that oral argument will substantially aid this Court in disposing of this appeal. Accordingly, Pintail does not separately request oral argument, but only asks that it be allowed to participate and present oral argument if this Court grants Appellants' request.

## ISSUES PRESENTED

1. Did the TCEQ have the discretion to approve Pintail's facility by way of a registration pursuant to Rule 330.9(b)(3) rather than requiring it to obtain a permit? In following the registration process, did the TCEQ violate Appellants' due process rights by affording all process due thereunder but not the heightened process available in connection with permit proceedings?

2. When neither statute nor agency rule prescribes any specific procedures for doing so, does the TCEQ have the discretion to choose when and how often to request that an applicant provide additional information deemed useful in processing an application?

TO THE HONORABLE COURT OF APPEALS:

Appellee Pintail Landfill, LLC (Pintail) files this Brief of Appellee, and in support of the judgment below, states as follows:

**INTRODUCTION**

This case asks whether the Texas Commission on Environmental Quality (TCEQ) complied with its statutory mandate and authority and its own rules when it authorized Pintail's transfer station by way of a registration. Pursuant to broad authority granted to it by the Legislature, the TCEQ has adopted rules establishing a regulatory program for facilities that manage municipal solid waste. Under those rules, some types of facilities (including landfills and other disposal facilities) must be authorized by TCEQ-issued permits. Other types of facilities (including transfer stations where relatively small volumes of waste are processed) must be authorized by registrations issued by the TCEQ. And certain other types of facilities (including citizen collection stations and pet cemeteries) can be authorized to operate simply by filing a notification with the TCEQ.

In this case, the TCEQ properly concluded that Pintail's proposed facility fit within a rule requiring the registration of municipal solid waste facilities that transfer less than 125 tons per day of materials. Appellants argue that, because waste will be separated and stored for very short periods of time before being transferred to other locations, Pintail's facility cannot be treated as a "transfer

station" and must be treated as a "material recovery operation" facility that, they argue, cannot be authorized by a registration.

This case implicates two subsections of section 330.9 of the Texas Administrative Code, Title 30, each requiring a facility that meets its requirements to be authorized by a registration. Pintail and the TCEQ relied on Rule 330.9(b)(3) as requiring Pintail's facility to be registered, while Appellants argue that, unless the facility fit within Rule 330.9(f), it could not have been authorized by registration.

Appellants misconstrue how section 330.9 operates. Rule 330.9(f) is not the exclusive provision by which Pintail's facility could be authorized by registration. Instead, a facility is required to obtain authorization by registration if it meets the conditions in any of the subdivisions of section 330.9. Pintail invoked the separate provisions of Rule 330.9(b)(3) because it sought to do that which is covered by that rule: operate a Type V transfer station that would transfer less than 125 tons of waste per day. Because Pintail's facility fits squarely within that rule, the TCEQ properly authorized Pintail's facility by way of a registration. And, as there is no assertion that Appellants were denied participation under the registration process, their denial of due process arguments necessarily fail.

Finally, no rule or statute prohibits the TCEQ from asking for additional information when it processes applications for facilities. In fact, such a rule would

have a series of significant unintended consequences that would undermine the rulemaking process, hamstring agencies from doing their jobs, punish good faith applicants, and ultimately frustrate the efficient operation of state agencies as they work with the private sector. As the TCEQ acted well within its discretion, no error is shown below.

## STATEMENT OF FACTS

### A. What this appeal is not about

Though Appellants' brief not-so-subtly attempts to blur the distinction between two separate proceedings before the TCEQ (the transfer station registration proceeding and the landfill permit proceeding), this case is not about Pintail's separate efforts to obtain a permit to operate a landfill. Pintail has filed a permit application for a proposed landfill, TCEQ has concluded the application is technically complete (satisfies all applicable permitting requirements), and that application is now the subject of a contested case hearing in which Appellants are participating. That application ultimately will stand or fall based upon its own merits.

But whatever happens in connection with the landfill has no bearing on the issue of whether Pintail's separate transfer facility was properly reviewed and approved by TCEQ pursuant to rules for registrations rather than for permits.[1]

---

[1] *See, e.g.,* 1Supp.CR 69 (TCEQ's "Public Comments" Letter, Response, at 4) (explaining that "[b]ecause the landfill permit application and the transfer station

Appellants' complaints about the landfill are outside the scope of review of the process used to approve Pintail's transfer station,[2] ultimately generating nothing more than a distraction from the questions they raise in this appeal. With that clarification in mind, the primary issue raised by this appeal may be addressed: Did TCEQ properly authorize Pintail's transfer operation by way of a registration pursuant to Rule 330.9(b)(3)?

**B.    An overview of the regulations governing the facility at issue**

Related TCEQ regulations apply to recycling facilities and municipal solid waste (MSW) facilities. As a general rule, recycling facilities are governed by rules contained in Chapter 328 of the Texas Administrative Code, 30 Tex. Admin. Code §§ 328 *et seq.*, while Chapter 330 applies to municipal solid waste facilities, *id.*, §§ 330 *et seq*. And the rules applicable to a particular facility may depend upon a number of factors that ultimately determine whether the TCEQ may authorize the facility by a permit, by registration, by notification, or by some other means.

As a general rule, recycling facilities are exempt from the permitting and registration requirements of Chapter 330 if they satisfy the conditions set forth in

_____

registration are separate and independent, a decision by the commission on one of the applications will have no bearing on the other.").
[2] *See id*. at 68 (noting that comments made regarding the landfill permit were outside the scope of review of the transfer station registration application).

4

Rule 328.4.  30 Tex. Admin. Code § 328.4(a).[3]   If a facility does not satisfy those conditions, it may be required to obtain a permit or registration as a municipal solid waste facility under the provisions of Chapters 330 or 332.  30 Tex. Admin. Code § 328.4(c).

## C.    Pintail's facility

Pintail sought TCEQ authorization to construct and operate a transfer station facility where it would separate, store and process construction and demolition waste[4] and recover recyclable materials from that waste.  1A.R. 1, §I ("Type V Registration Application").  The transfer station for which Pintail sought approval is a 100' by 100' metal building on a concrete slab.  *Id*., §IIIA-3, 2.2.  Trucks would bring materials into the building where recyclable materials would be separated from construction debris and sorted into various components (wood, metal, concrete, and cardboard) for transfer to recycling facilities, with the residual waste remaining at the facility for no longer than 72 hours before being separately transferred to a landfill for disposal.  CR 22.  Pintail's operation would involve the processing of no more than 94 tons of material per day (approximately 18 truck loads).  1Supp.CR 70.

---

[3] Waste separation and recycling facilities that satisfy all of the conditions of Rule 328.4 may be authorized by mere notification pursuant to Rule 328.5  *See* 30 Tex. Admin. Code § 328.5; *see also* 30 Tex. Admin. Code § 330.11(a).

[4] "Waste resulting from construction or demolition projects; includes all materials that are directly or indirectly the by-products of construction work or that result from demolition of buildings and other structures, including, but not limited to, paper, cartons, gypsum board, wood, excelsior, rubber, and plastics." 30 Tex. Admin. Code § 330.3(33).

Pintail's facility is a recycling-focused transfer station, and, pursuant to Chapter 328, such facilities are generally excused from any registration or permitting requirements.[5] But, in order for a recycling facility to operate without a permit or registration, the facility must comply with the operational requirements of Chapter 328. One such requirement is a limit on the amount of non-recyclable materials that may be processed at the facility:

> A facility that processes recyclable material that contains **more than incidental amounts** of non-recyclable waste must obtain a permit or registration as applicable under Chapter 330 or Chapter 332 of this title unless the executive director approves its request for alternative compliance.[6]

At the time Pintail prepared and submitted its application for registration, it could not determine the precise percentage of non-recyclable solid waste that might remain after the separation of recyclable materials. So Pintail conservatively assumed that more than "incidental" amounts of non-recyclable waste would remain, and filed with TCEQ an application for registration under Chapter 330 as required by § 328.4(d). *See* 1A.R. 1, *et. seq.*

---

[5] *See* 30 Tex. Admin. Code § 328.4(a). Such facilities may be authorized by notification pursuant to Rules 328.5 and 330.11(a).

[6] 30 Tex. Admin. Code §328.4(d) (emphasis added). "Incidental amounts" is defined as "Non-recyclable waste that accompanies recyclable material despite reasonable efforts to maintain source-separation and that is no more than 10% by volume or scale weight of each incoming load, and averages no more than 5% of the total scale weight or volume of all materials received in the last six-month period, as substantiated by the facility's records." 30 Tex. Admin. Code §328.2(3).

6

Pintail determined that the transfer station for which it sought authorization fit within the provisions of Rule 330.9(b)(3), such that registration of the facility would be required thereunder. That rule provides:

> A registration is required for an MSW transfer station facility that is used in the transfer of MSW to a solid waste processing or disposal facility from any of the following: … (3) a facility used in the transfer of MSW that transfers or will transfer 125 tons per day or less.

30 Tex. Admin. Code § 330.9(b)(3). The invocation of Rule 330.9(b)(3) was consistent with agency guidelines promulgated in TCEQ Publication No. RG-469, "Traditional Municipal Solid Waste Disposal: A Guide for Local Governments." That publication notes that "To be eligible for registration as a transfer station, the facility must meet one of the following criteria . . . It transfers or proposes to transfer no more than 125 tons per day of MSW." *See* CR 424-25.

Because Pintail's transfer station facility is intended to transfer a type of municipal solid waste (MSW) – construction or demolition waste – and was intended to transfer less than 125 tons per day, it fit within the parameters of Rule 330.9(b)(3). Thus, Pintail's application invoked that rule in its request for authorization by way of a registration. *See* 1A.R. 1 at I, p.2.

**D.** **Appellants' active participation in the registration process**

From the outset, Appellants have been active and vocal participants in the transfer station application review process at the TCEQ. For example, counsel for Appellants provided written comments and provided comments at the TCEQ

7

public meeting concerning the application. *See, e.g.,* 1Supp.CR 64-67 (listing Appellants' counsel as offering comments either in writing or at the meeting); *see also* 9A.R. 67 (containing CALH's comments as to the transfer station). Additionally, they filed other miscellaneous items with the TCEQ in connection with the application, *see, e.g.,* 7A.R. 41 (letter from CALH's counsel); 7A.R. 2 (letter from City of Hempstead's counsel); and, after the application was approved, they filed motions to overturn, *see* 2Supp.CR 88 (CALH's Motion to Overturn)[7]; CR 92 (City of Hempstead's Motion to Overturn).

**E.     The application process**

After Pintail filed its application, the TCEQ requested that Pintail provide additional information on a number of different topics so that it could go forward with consideration of the application.  It did so by way of a "Notice of Deficiency" or "NOD".  2A.R. 13.  Pintail responded in good faith and addressed the identified matters.  2A.R. 17; 3A.R. 18.  As the TCEQ continued its review of Pintail's application and the additional information it provided, the TCEQ made another request to Pintail by way of a second Notice of Deficiency.  4A.R. 22.  This second notice requested various new categories of information not previously identified, and sought additional follow-up on several categories identified in the first NOD.

---

[7] Although in the trial court and on appeal, Appellants CALH, Michael McCall, and Wayne Knox have proceeded as co-parties, the individuals did not join CALH in its Motion to Overturn, which was filed exclusively in the name of CALH.  2Supp. CR 88.

*Id*. Again, Pintail responded in good faith, addressing the matters requested by the TCEQ. 5A.R. 29. This process continued several more times during the TCEQ's consideration of Pintail's application, with each successive agency request seeking fewer and fewer new categories of information from Pintail.[8] On July 13, 2013, TCEQ's executive director provided written responses to public comments that had been filed regarding Pintail's application. *See* CR 64-96 (categorizing and responding to comments). The TCEQ ultimately declared the application technically complete, 7A.R. 54, and on July 23, 2013, issued a registration authorizing the facility, 7A.R. 55, CR 20.

F.     **Subsequent challenges to the registration**

As noted, both CALH and City of Hempstead filed motions to overturn TCEQ's issuance of the registration. CR 92; 1Supp. CR 88. The Office of Public Interest Counsel (OPIC) at the Texas Commission on Environmental Quality filed responses to those motions, CR 116, as did the TCEQ's executive director, 8A.R. 62, and Pintail, 8A.R. 63. Thereafter, the motions were overruled by operation of law, 8A.R. 66, and CALH and the City of Hempstead perfected appeal to the district court.

---

[8] The entire chain of "Notices of Deficiencies" are found at 1Supp.CR 37-62.

## G.    The district court appeal

At the district court, the parties filed briefs and submitted a joint administrative record, and then presented oral arguments on their briefs. (By agreement of the parties, that argument was not transcribed beyond the announcements of counsel and the offer of the administrative record as the parties' joint exhibit. RR 1-7.) On September 4, 2014, the Honorable Scott Jenkins rendered judgment affirming TCEQ's approval of Pintail's registration, CR 503, and on October 16, 2014, he overruled Appellants' motion for new trial, CR 674.

## SUMMARY OF ARGUMENT

Registration (in response to Appellants' issues 1 and 2): The TCEQ properly allowed Pintail to apply for a registration for its facility pursuant to Rule 330.9(b)(3) because it had a reasonable basis to conclude that Pintail's facility fit within that rule. Appellants' reliance on Rule 330.9(f) and their arguments that, because Pintail's facility did not meet the requirements of that rule it could not be authorized by registration and instead was required to obtain a permit, are misplaced. Rule 330.9(f) is not the exclusive rule requiring/allowing the registration of a facility, and neither Pintail's application nor TCEQ's approval relied on it to justify using the registration process.

Instead, Pintail invoked, and TCEQ relied on, Rule 330.9(b)(3) as the applicable authority for approval of Pintail's facility by way of a registration. 30 Tex. Admin. Code § 330.9(b)(3). Pintail's facility fits squarely within that

10

provision given the anticipated low volume of materials that would be transferred on a daily basis. Appellants' arguments that a transfer station facility cannot also provide separation, storage and processing of materials and still fit within Rule 330.9(b)(3) offend both the realities of what happens on a daily basis at transfer stations across the state (as the TCEQ is well aware), and the literal language of the applicable rules.

Appellants separate due process arguments necessarily fail as well. There is no question that the registration process only provides certain participatory rights to the public, and that Appellants were afforded and exercised all such rights. Nor is it disputed that the registration process does not afford any right to a contested case hearing. Accordingly, Appellants were afforded all process that was due under the authorization procedures applicable to Pintail's application.

Excessive "Notices of Deficiencies" (in response to issue 3): Appellants waived any complaint about the number of "notices of deficiencies" (NODs) by citing no authority demonstrating error below or justifying the vacatur of the agency's approval of Pintail's registration application. In any event, neither statutes nor rules constrain the number of NODs the TCEQ may issue when reviewing an application, and the TCEQ was well within its discretion in making more than two requests while processing Pintail's application, particularly when successive requests by the agency sought new categories of information not

11

previously identified as deficient by the TCEQ. Finally, numerous practical problems plague the procedures Appellants urge this Court to require the TCEQ to follow. These problems would result in significant unintended consequences that would delay or shut down meritorious projects simply because an agency is being diligent in identifying information it needs to review in passing on an application.

In short, no error, let alone reversible error, is shown in the district court's ruling affirming the TCEQ's order.

## ARGUMENTS AND AUTHORITIES

### I.     Standard of Review

While couched in terms of whether the trial court erred in affirming TCEQ's approval of Pintail's facility by registration, the premise of each of Appellants' asserted theories is that the Executive Director of TCEQ abused his discretion by issuing the registration, either because he misinterpreted agency rules or because of how the agency interacted with Pintail in processing the application. *See* Brief at 14-15.

Findings, inferences, conclusions, and decisions of administrative agencies are subject to deference, and an agency's interpretation or construction shall not be disturbed unless it is plainly erroneous or inconsistent with the language of the statute, regulation, or rule. *Heritage on the San Gabriel Homeowners Assoc. v. Tex. Comm'n on Envt'l Qual.*, 393 S.W.3d 417, 424 (Tex. App.—Austin, 2012, pet. denied). A reviewing court may not substitute its judgment for that of the

agency, and the issue is not whether the agency reached the correct conclusion, but whether there is some reasonable basis in the record for its action. *See Southwestern Public Serv. Co. v. Public Util. Comm'n*, 962 S.W.2d 207, 215 (Tex. App.—Austin 1998, pet. denied); Fleetwood *Community Home v. Bost*, 110 S.W.3d 635, 639 (Tex. App.—Austin 2003, no pet.). Under that standard, Judge Jenkins properly concluded that the actions of the TCEQ must be affirmed because they were based on appropriate interpretations of the agency's own rules and supported by a reasonable basis in the record.

## II. The TCEQ properly authorized Pintail's facility by way of a registration

In responding to public comments, the TCEQ observed that Pintail's application met "the requirements for a registration in accordance with 30 TAC § 330.9(b)(3), for a facility used in the transfer of C&D waste that will transfer 125 tons per day or less." 1Supp. CR 69 (TCEQ's July 16, 2013 "Public Comment Letter Response" at 5). Then, in its "Registration for Municipal Solid Waste (MSW) Management Site," the TCEQ authorized the "Pintail Landfill Transfer Station," and authorized Pintail "to store and process wastes, and to recycle recovered materials" in accordance with restrictions and limitations set forth in the registration document. CR 20. The TCEQ treated the facility as a "Type V Transfer Station", CR 22, § I.A., and authorized Pintail "to separate, store, and transfer construction and demolition waste, as defined in 30 TAC 330.3(33), from

the construction, and demolition of residential, community, commercial, institutional, and recreational activities." *Id*. §II.B. The registration further authorized Pintail to recover and transfer recyclable materials to an authorized facility and required all remaining waste to be transferred to an authorized disposal facility. *Id.* The TCEQ acted well within its rules and its discretion in doing so – it had a reasonable basis to conclude that a facility processing less than 125 tons per day fit within Rule 330.9(b)(3).

**A.    TCEQ's registration of Pintail's facility fit within its broad regulatory discretion**

This case asks whether the TCEQ complied with its statutory authority and its own rules when approving Pintail's application for registration of its transfer station. It did.

TCEQ's authority is conferred by statute:  the Solid Waste Disposal Act, Chapter 361 of the Texas Health and Safety Code. *See* Tex. Health & Safety Code, §§ 361.011 *et seq.* The TCEQ has been directed by the Legislature to "control[] all aspects of the management of municipal solid waste," and tasked to do so "by all practical and economically feasible methods". Tex. Health & Safety Code, §§ 361.011(b). That statute gives the TCEQ extremely broad authority, and does not impose any primary or default means by which it must exercise that authority. Section 361.061 of the Texas Health & Safety Code further empowers, but does not mandate, the TCEQ to require and issue permits for the construction

14

and operation of solid waste facilities: "…the commission [TCEQ] *may* require and issue permits authorizing and governing the construction, operation, and maintenance of solid waste facilities used to store, process, or dispose of municipal solid waste…" *Id*. § 361.061. Thus, while the enabling statutes confer the power on the TCEQ to manage facilities through a permit process, those statutes do not require it to do so.

As an alternative to requiring and issuing permits, the Commission may use other methods of control. *See McDaniel v. Texas Natural Resource Conservation Commission*, 982 S.W.2d 650, 652 (Tex. App.—Austin 1998, pet. denied). Pursuant to its statutory mandate and authority, the TCEQ has adopted rules establishing a variety of mechanisms for approving different types of facilities.[9] These mechanisms include permitting,[10] registration,[11] and notification,[12] and the rules allow some activities to be conducted without any permitting, registration or notification.[13] Each of these different authorization mechanisms entails different requirements for information to be submitted to the TCEQ in the application process, and different levels of opportunity for public participation.[14]

---

[9] *See generally*, 30 Tex. Admin. Code, ch. 330, and § 330.5.
[10] 30 Tex. Admin. Code § 330.7.
[11] *Id.* § 330.9.
[12] *Id.* § 330.11.
[13] *Id.* § 330.13.
[14] For example, rules governing permitting require that a variety of different notices be provided to the public at various times in the process (*see, e.g.,* 30 Tex. Admin. Code ch.

In essence, Appellants contend that Pintail's facility did not fit within provisions of section 330.9 providing for the authorization by registration and because it did not, the TCEQ had no discretion but to require the facility to be permitted. But that argument – that the TCEQ lacked the authority to allow the operation of municipal solid waste facilities by registration instead of by permit – has been rejected by this Court. In *McDaniel*, this Court upheld the issuance of a registration authorizing a facility for the disposal of sewage sludge, a form of municipal solid waste. 982 S.W.2d at 652. In that case, the plaintiff complained that the TNRCC[15] lacked authority to authorize a sludge disposal facility by way of registration, and that it should have required the applicant to invoke the permitting process instead. *Id.* at 651. This Court recognized that, throughout the Solid Waste Disposal Act, the agency "is given the authority to administer the Act using different levels of regulation, including both permitting and registration." *Id.* at

39); allow interested persons to file comments and/or request public meetings concerning the application (*see generally* 30 Tex. Admin. Code ch. 50), and allow affected persons to request contested case hearings (*see generally* 30 Tex. Admin. Code ch. 55, 80), move to reconsider a decision (30 Tex. Admin. Code ch. 55), and appeal a TCEQ decision to district court (*see* Tex. Health & Safety Code § 361.321; Tex. Water Code § 5.351).

In contrast, rules governing the registration process afford fewer opportunities for public participation. They require an applicant to provide public notice of the filing of a registration application (*see* 30 Tex. Admin Code ch. 39), and allow interested persons to file comments, request public meetings, and, in the event a registration is approved, move to overturn the approval (*see generally* Tex. Admin Code ch. 55)*,* and appeal the TCEQ's decision to district court (*see* Tex. Health & Safety Code § 361.321; Tex. Water Code § 5.351). Rules governing registrations do not contain provisions for contested case hearings. *See McDaniel*, 982 S.W.2d at 652.

[15] The Texas Natural Resource Conservation Commission was a predecessor agency to the Texas Commission on Environmental Quality.

16

652. This Court acknowledged that the permitting process allows certain individuals to request a contested case hearing, while the registration process does not. *Id.*, n.3 (citing 30 Tex. Admin. Code §§ 312.13(b, c) (1998)). Even so, this Court upheld the Commission's regulation of municipal solid waste activities through registrations to be "reasonable and consistent with its powers and duties under the Act." *Id.* at 653.

In considering the registration program at issue in *McDaniel* (for sewage sludge disposal facilities), this Court recognized the steps required prior to approval of the registration:

- An applicant must notify the commission of the proposed activity.
- An applicant must submit information to allow the Commission to determine whether the activities comply with its rules.
- The Commission can only approve the registration after reviewing it in light of the rules governing the activity.
- If the Commission approves the registration, it must provide notice and an opportunity to comment.

*Id.*

Those same procedural safeguards are also present in the TCEQ's registration program for transfer stations like Pintail's. *See generally* 30 Tex. Admin. Code § 330.69. These procedural safeguards were complied with in the processing of Pintail's application for registration, and the TCEQ determined that the proposed facility would comply with the substantive requirements of the

17

TCEQ's rules.[16]  Accordingly, the TCEQ acted within its discretion in authorizing Pintail's facility by registration.   As in *McDaniel*, the TCEQ's use of the registration process in connection with Pintail's facility was reasonable and consistent with its powers and duties under the Solid Waste Disposal Act.

**B.    Neither of the Rule 330.9 sections relied upon by Appellants demonstrates any error in the registration of Pintail's facility**

**1.    Why Rule 330.9(b)(3) applies to Pintail's facility**

The TCEQ has been directed by the legislature to establish regulations that support the diversion of materials from solid waste streams and to promote the economic recovery and reuse of materials. 30 Tex. Admin Code § 328.1. To comply with those directives and facilitate recycling, TCEQ Rule 328.4(a) provides that recycling facilities are exempt from both registration and permitting requirements if they comply with all of the conditions of that section.   One requirement relates to the amount of "incidental waste", as defined by Rule 328.2(3), that may be processed at a facility.  If a facility processes more than an "incidental amount of waste," then it is not exempt, and instead must obtain a permit or registration, as applicable, under Chapter 330 or 332.  30 Tex. Admin. Code § 328.4(d).

Pintail's facility is intended as a Type V transfer station at which recyclable materials would be separated from construction and demolition waste.  *See* 1A.R.

---

[16] See 7A.R. 55.

1, §I (applying for Type V transfer station); CR 22 (registering a Type V transfer station). A Type V facility is defined in Rule 330.5(a)(3):

> Separate solid waste processing facilities are classified as Type V. These facilities include processing plants that transfer, incinerate, shred, grind, bale, salvage, separate, dewater, reclaim, and/or provide other storage or processing of solid waste.

30 Tex. Admin. Code § 330.5(a)(3). And a "transfer station" is defined in Rule 330.3(157) as:

> a facility used for transferring solid waste from collection vehicles to long-haul vehicles (one transportation unit to another transportation unit). It is not a storage facility as one where individual residents can dispose of their waste in bulk storage containers that are serviced by bulk collection vehicles.

30 Tex. Admin. Code § 330.3(157).

This transfer station is intended to be a facility where incoming collection trucks arrive with construction and demolition waste and debris, where the loads would be processed and separated, then transported by other trucks taking the recyclable materials to appropriate facilities for recycling and the residual waste to a landfill for disposal. *See, e.g.,* 1A.R. 1, §IIIA-6 (describing intended process). The facility *is* a transfer station because *in addition to* separating recyclable materials in incoming loads from the remaining solid waste, the *facility will be used for* transferring the residual solid waste to permitted facilities for disposal.

Using a facility for transferring solid waste does not preclude using the facility for other processing, such as separation, and temporary storage. Because

Pintail's Type V facility will process recyclable materials that will or may contain more than incidental amounts of solid waste, the TCEQ properly authorized the facility by way of registration as a transfer station, a facility that is used for transferring solid waste.

Because it was anticipated that Pintail's facility could process more than an incidental amount of waste, Pintail considered whether its facility fit within any of the sections of section 330.9 that allow MSW facilities to be authorized by registration. Section 330.9 identifies a variety of circumstances requiring that a facility be authorized by registration, and Rule 330.9(a) requires an applicant submitting a registration application to also submit a statement justifying the facility's eligibility for registration. 30 Tex. Admin. Code § 330.9(a). Pintail invoked Rule 330.9(b)(3) as supporting its registration application "for a Type V Transfer Station that will transfer 125 tons per day or less, in accordance with § 330.9(b)(3)." 1A.R. 1 at I-2. Its application indicated the facility would involve storage and processing of materials, but not disposal, and that the facility would serve as a transfer station. *Id*.

As noted, that description placed Pintail's facility squarely within the registration provision in Rule 330.9(b)(3), which requires registration of "an MSW transfer station facility that is used in the transfer of MSW to a solid waste processing or disposal facility from . . . (3) a facility used in the transfer of MSW

that transfers or will transfer 125 tons per day or less." 30 Tex. Admin. Code § 330.9(b)(3). Pintail's facility would process and temporarily store construction and demolition waste and separate it into recyclable and non-recyclable components before transferring all materials to their respective final destinations. The facility thus constitutes a transfer station subject to the provisions of Rule 330.9(b)(3).

## 2. Why Pintail did not have to invoke Rule 330.9(f)

Appellants argue that a permit was required for Pintail's facility because Pintail cannot satisfy the provisions of Rule 330.9(f), contending that the facility cannot be viewed as a transfer station but must be viewed as a material recovery facility. But Pintail did not have to invoke that rule and could instead rely on Rule 330.9(b)(3), the provision that squarely fits its circumstances.

### a. 330.9(f) does not apply to "all" new facilities, just those that meet all of it provisions

Appellants argue that Rule 330.9(f) applies to any transfer station that includes material recovery operations, but the text of the rule simply does not support that argument. By suggesting Rule 330.9(f) is the exclusive provision for authorizing a new MSW processing facility such as Pintail's, Appellants' interpretation does violence to the very rule they quote.

The operative language of Rule 330.9(f) provides as follows: "A registration is required for any new MSW Type V transfer station that includes a

21

material recovery operation *that meets all of the following requirements*. . . ." 30 Tex. Admin. Code § 330.9(f). Appellants read the applicability of the rule as if it ended eighteen words into the provision ("A registration is required for any new MSW Type V transfer station that includes a material recovery operation. . .") and without regard to the other applicability conditions that follow. While they read the rule as applying to any transfer station that includes a material recovery operation, the rule's applicability requires more than that.

By its own terms, Rule 330.9(f) has four requirements that must be met before it applies to a particular facility: the facility must (1) be a "new MSW Type V transfer station", that (2) "includes a material recovery operation" which, in turn, "meets all of the following requirements" such that the facility satisfies (3) a 10% minimum recycling provision <u>and</u> (4) a requirement that remaining waste be disposed of at a landfill located within 50 miles. *See* 30 Tex. Admin. Code § 330.9(f). If a new material recovery facility meets all those conditions, then Rule 330.9(f) applies; if not, the rule is inapplicable. But whether Rule 330.9(f) applies or does not apply does not prohibit an applicant from invoking some <u>other</u> subsection of 330.9 that is applicable to a facility's particular circumstances.

### b. A transfer station facility may also store, separate, and process materials for recycling

Appellants argue that because Pintail's facility has been authorized to engage in activities such as processing, separating and storing waste, it is by

definition a "material recovery facility" and thus, by definition, it cannot also be a "transfer station." Brief at 38. But that argument not only misconstrues the common sense interpretation of those rules, it also disregards the TCEQ's discretion in construing its own rules.

The fact that the TCEQ's approval authorizes storage and processing does not disqualify this facility from being authorized by way of a registration. Storage and processing are part of the normal operations of a Type V transfer station. In fact, TCEQ's rules recognize that Type V facilities include "***processing plants that transfer***, incinerate, shred, grind, bale, salvage, ***separate***, dewater, reclaim, and/or provide ***other storage or processing*** of solid waste" 30 Tex. Admin. Code § 330.5(a)(3) (emphasis added).

Pintail's registration authorizes storage and processing of non-putrescible construction and demolition waste from residential, community, commercial, institutional and recreational activities. CR 22. The registration specifies that the maximum storage time for unprocessed and processed wastes is 72 hours, and that within that time the waste must be transferred to an authorized disposal facility. *Id*. Storage and processing occur at Type V transfer stations every day across the state, and in fact it would be impossible to operate a transfer station without the storage or processing of waste.[17]

---

[17] The transfer of waste is included within the definition of "processing" in TCEQ's rules:

This view of the rules is not novel: it was shared by the Office of Public Interest Counsel in its "Response to Motions to Overturn". *See* 2Supp.CR 120-22. There, OPIC observed that activities such as storage, processing, or removal of solid waste may be authorized by a registration, and that the language contained in Pintail's registration must be read in the context of the overall authorization, wherein the authority to separate, store, process, and recover materials is conditioned upon the prompt transfer of all such material from the facility. *Id*.

Indeed, even the TCEQ's own publication, "Traditional Municipal Solid Waste Disposal: A Guide for Local Governments," described the agency's interpretation of transfer stations as involving a storage component:

> Transfer facilities offer an alternative when the landfill is so far away that it is not economical for each waste collection vehicle to make round trips. Transfer stations allow local waste haulers **to temporarily store waste** and then use large-volume trucks to haul waste to the distant landfill.

CR 424 (emphasis added).

The TCEQ was thus well within its discretion in concluding that Pintail's facility fit within the registration provisions of Rule 330.9(b)(3).

---

**Activities including, but not limited to, the** extraction of materials, **transfer**, volume reduction, conversion to energy, or other separation and preparation **of solid waste** for reuse or disposal, including the treatment or neutralization of waste, designed to change the physical, chemical, or biological character or composition of any waste to neutralize such waste, or to recover energy or material from the waste, or render the waste safer to transport, store, dispose of, or make it amenable for recovery, amenable for storage, or reduced in volume.

30 Tex. Admin. Code, § 330.3(117) (emphasis added).

**C. Due process issues do not justify disturbing TCEQ's approval of the registration application.**

Appellants' "due process" argument fails for at least the following reasons. Appellants were afforded all process that is due under the applicable registration procedures, as they were given the opportunity to be heard by public comment and at a public meeting, and were given the opportunity to be heard by way of motions to overturn the approval of Pintail's registration. Moreover, any rights Appellants have to participate in a contested case hearing concerning Pintail's proposed landfill were not limited by the procedures applicable to the transfer station registration. Finally, TCEQ's use of registration procedures rather than permitting procedures for approval of Pintail's transfer station did not implicate any constitutionally protected rights, and any interest Appellants may have had did not alter the level of process provided by statute or rule.

**1. Appellants' due process arguments are derivative of their rule-based arguments – Appellants received all process to which they were entitled under the governing statutes and rules**

Appellants do not dispute that procedures for registration applications provide for less extensive public participation than do procedures governing permit applications. The permitting process allows certain individuals to request a contested case hearing in connection with an application, while the registration process does not. *See* 30 Tex. Admin. Code §§ 312.13(b),(c).

Appellants complain that by authorizing Pintail to use a registration process, the TCEQ deprived them of the right to request a contested case hearing in connection with the transfer station that they would have had under permitting procedures. Notably, they do not argue that they were denied the participation due under the registration procedure rules. That distinction is key because it confirms that the due process argument depends entirely on a finding that the wrong approval scheme (registration rather than permitting) was used in the first instance, and that argument is thus entirely derivative of Appellants' argument that the TCEQ should have followed permitting procedures instead of registration procedures in processing Pintail's transfer station application. To the extent the TCEQ properly authorized Pintail's facility by registration as discussed above, Appellants have no due process argument to make, as they received all process they were due under the registration procedures.

2.      **Appellants' rights to a contested case hearing in connection with Pintail's application for a separate landfill permit are not undercut by TCEQ's approval of the transfer station by registration**

Appellants next argue that TCEQ's authorization of the transfer station by way of a registration denied them the opportunity for a hearing on the storage and recycling component of Pintail's proposed landfill facility. Brief at 41. But that argument inappropriately collapses the two proceedings. As the TCEQ properly noted, the landfill permit application and the transfer station registration

application were "subject to different requirements and must be reviewed independently." CR at 68. Appellants are being afforded their right to a contested case hearing – but in the proper context, i.e., in connection with their challenge to the landfill permit.

### 3. The existence of any "property rights" does not morph the procedures that are otherwise authorized by law

"The constitutional right to due process is not . . . an abstract right to hearings conducted according to fair procedural rules. Rather, it is the right not to be deprived of life, liberty or property without such procedural protections."[18] Appellants allege they have property interests that would be affected by the proposed facility. Brief at 41. But they cite to no authority that would entitle them to a contested case hearing to advocate in support of those rights when the governing rules only allow for public comment, public meeting, and the motion to overturn process. Under the governing rules, Appellants were entitled to comment on the application, participate in a public meeting concerning the facility, and file motions to overturn and replies. They cite to nothing saying that simply because they made the naked assertion of a property interest,[19] they were somehow entitled to additional process not otherwise afforded by applicable law.

---

[18] *Monk v. Huston*, 340 F.3d 279, 282-83 (5th Cir. 2003).
[19] Appellants do not even allege how the approval of the registration for Pintail's Type V Facility will have any impact on the property interests they assert. Nor do they point to any evidence in the record that TCEQ's approval of Pintail's Type V Facility would, or

**4.** **Authorization of the facility by registration rather than permit did not implicate any constitutionally protected rights**

Appellants' due process argument fails for another reason: even if the registration process implicated any constitutionally protected interests, such a fact would not entitle them to more process than what they were afforded. Even if, as they argue, they had property interests that would be affected by the transfer station (a point they do not substantiate and that Pintail does not concede), such a fact would not entitle them to more process than otherwise due by statute or rule to any other similarly-situated party. Whatever interests Appellants may have might entitle them to invoke the full spectrum of opportunities to be heard and to contest Pintail's application under the means afforded by rule and statute, but whatever those interests may be, they do not confer additional rights to be heard that do not otherwise exist.

**5.** **Absent a statutory or rule-based right to a hearing, the use of a registration process could not violate any due process rights**

Appellants' argument ultimately collapses upon itself. Appellants conclude by asserting that "[w]hen there is a statutory right to a hearing and a right to a hearing under applicable rules, denial of the hearing is a violation of procedural due process." Brief at 41- 42. As a general proposition, that statement is true. But Appellants point to no statutory right to a hearing that attaches to an application for

---

even could, have any impact on any groundwater or groundwater rights or other property rights.

a registration, nor can they point to any rule entitling them to a hearing under such circumstances. So, here, the converse of Appellants' position controls: <u>in the absence</u> of a statutory right to a hearing or a right to a hearing under applicable rules, procedural due process does not require that a hearing be provided.

Appellants' constitutional due process claims are unfounded.

## III. The trial court correctly affirmed TCEQ's issuance of the registration over Appellants' "too many NODs" argument

Appellants' final argument fails for three essential reasons. First, the argument is waived in its entirety pursuant to Texas Rule of Appellate Procedure 38.1(i) because Appellants cite no authority to demonstrate the existence of a legal principle they claim was violated, or to demonstrate that any such violation required the underlying order to be vacated.

Second, Appellants' argument depends upon rules that do not exist. No authority limits TCEQ to two requests for information from an applicant for approval of a transfer station. Instead, the TCEQ has the discretion to determine when additional information regarding a proposed facility is necessary and to work with an applicant to obtain that information to assist with the processing of an application.

Finally, were this Court to adopt the position advocated by Appellants and transform internal operating procedures, summaries, and guidelines into general and inflexible rules, the result would not only utterly undermine the ability of

agencies to fulfill their statutory duties, but would undercut the transparency and the opportunity for public participation provided by formal rulemaking procedures.

## A. Appellants waived any complaint about the number of NODs

In support of their theory, Appellants do not cite a single legal authority. They cite no authority which they contend limits the number of NODs an agency may issue, no authority holding that statements made regarding how the agency processes applications can have the force and effect of statutes or rules that bind the agency, and no authority saying that any departure from any statement an agency may make about processing applications somehow renders the approval of an otherwise valid and meritorious application void and subject to being set aside after the fact. In the absence of any references to authorities to support these theories, Appellants have waived any error. *See Fredonia State Bank v. General American Life Ins. Co.*, 881 S.W.2d 279, 284-85 (Tex. 1994). This issue should be disregarded in its entirety.

## B. Texas law does not treat agency statements about internal procedures as equivalents to promulgated rules or statutes

### 1. No rules or statutes limit the TCEQ to issuing only 2 NODs

There are no statutory provisions or TCEQ rules that limit TCEQ to issuing only two NODs during its review of an application for a registration (or any other type of authorization) for a municipal solid waste facility. Because Appellants have not and cannot identify any statute or rule that was violated by the issuance of

more than two NODs, their request to have the TCEQ's approval of Pintail's registration invalidated on this basis must be denied.

2. **TCEQ's so-called "policy statements" do not set any "2 NOD" limits.**

On appeal, Appellants argue that the back-and-forth process between the TCEQ and Pintail was "in direct conflict" with "the TCEQ policies outlined in the MSW registration process description, which is located in a 2009 TCEQ Sunset Evaluation Report." Brief at 43. The "outlined policy" they reference is a flow chart demonstrating the typical path by which applications are processed. *See* CR 146. Such a demonstrative aid does not prescribe an agency's discretion, does not limit the number of requests it can make of a particular applicant in processing an application, and does not mandate that, in lieu of requesting additional information, an agency return what appears to be an otherwise meritorious application.

Appellants also quote a TCEQ document that purports to provide instructions on how applications should be processed. *See* Brief at 45, n. 100 (citing to Exhibit 3 to CALH's Reply to Responses to Motion to Overturn, found at 8A.R. 65) (the quoted document is also found at 2Supp.CR 152, with the paragraph quoted by Appellants found on page 154). Notably, while Appellants quote this document as constraining the agency's discretion in processing applications and mandating that an application be returned after an insufficient response to a second NOD, by its own terms it does no such thing.

In evaluating a response to a second NOD, the document indicates that the staff should exercise discretion to decide whether "significant" deficiencies still exist, in which case the application should be returned. But the corollary is that if the application is not returned, then any deficiencies found by the agency were not significant enough to warrant such a disposition. That document also references the staff's discretion to continue working with an applicant to resolve deficiencies in an application that are identified in the course of the agency's review. The distinction between significant and insignificant deficiencies, and the discretion to classify any deficiencies, confirms that the agency retains the power to continue working with an applicant, and to seek additional information in support of an application, even after receiving a response to a second NOD. That distinction defeats Appellants' argument, and the document sets forth no policy mandating the automatic rejection of an application after a deficient response to a second NOD.

More relevant is the TCEQ's April 11, 2012 internal memorandum contained in the record as an exhibit to the City of Hempstead's motion to overturn, but not cited by Appellants on appeal. *See* CR 167. That memorandum is more relevant because it is sourced (shows who it is from and to whom it is directed); and because its effective date was prior to the issuance of the third NOD to Pintail. The policy in effect when Pintail's application was being processed simply did not refer to any limits on the number of NODs. Instead, it directed that

"[i]f the response to the 2nd NOD does not satisfactorily address the deficiencies, the [project manager] should discuss the issues with the [team leader] to determine the next course of action." CR 169.

Moreover, Appellants' superficial summary of what happened below disregards the reality of what had been requested by the TCEQ of Pintail. Consistent with its discretion to continue working with applicants to resolve deficiencies, the TCEQ's successive requests either (1) identified entirely new topics of information that staff had not previously requested of Pintail and, accordingly, for which Pintail could hardly be blamed for having not previously produced,[20] or (2) identified follow-up matters to be addressed after responses to earlier inquiries. Whether the TCEQ staff continued to work with Pintail by way of a document called a "Notice of Deficiency" or by way of letters simply asking for more information on particular topics should not be fatal to the application.

### 3. Informal TCEQ statements do not constrain the discretion of the agency to consider more, rather than less, information

Even if any statements referenced by Appellants could be considered agency statements of general applicability describing policy or procedure, they cannot constitute enforceable rules governing the processing of Pintail's application. That

---

[20] Indeed, had TCEQ rejected Pintail's application based upon its successive requests for new categories of information, such a rejection would have been subject to challenge as being arbitrary and capricious because Pintail has the right to know what is expected of it so it may comply. *See Starr County v. Starr Indus. Servs.*, 584 S.W.2d 352, 356 (Tex. Civ. App.—Austin, 1979, writ ref'd n.r.e.).

is the very point of *Combs v. Entertainment Publications, Inc.*, 292 S.W.3d 712 (Tex. App.—Austin 2009, no pet.). In *Combs*, when the Comptroller attempted to rely on letters sent to trade associations as setting forth agency policy, this Court recognized that even if the letters could be considered "rules", they were necessarily invalid and unenforceable because they had not been adopted pursuant to the rule-making requirements of the Administrative Procedure Act (Tex. Gov't Code, Subchapter B, §§2001.021-041). 292 S.W.3d at 723.

For the same reason, any statement by the TCEQ, its Executive Director, or any unidentified member of the agency staff, to the effect that there is a limit on the number of NODs to be used in processing an application for registration cannot constitute a valid and enforceable rule, unless adopted pursuant to the rule-making procedures established by the Administrative Procedure Act. As nothing shows that the statements Appellants rely upon as setting a two NOD limit were adopted in compliance with that Act, the claim of an enforceable limit on the number of NODs must fail.

**C.     Practical reasons demonstrate why the statements at issue were not binding as if they were rules or statutes**

Finally, various practical reasons demonstrate the mischief inherent in the result advocated by Appellants.

If the TCEQ were obligated to reject a registration application simply because, after a second NOD, it identified additional information it would like to

review, perverse results would occur. The TCEQ would be deprived of a means to seek additional information on a topic whose relevance only becomes apparent as a result of its review of other information provided in response to earlier agency inquiries. If a "2 NOD limit" were in place, the agency would be forced to do one of three things, none of which are desirable: (1) wait to request information from an applicant until it completes an initial review of all information provided (even though interim requests for additional information may facilitate a more efficient review of the application); (2) refrain from making any request for additional categories of potentially relevant information after the second NOD and decide whether to grant or deny an application without the benefit of all relevant information, or (3) arbitrarily deny or return an application if, after two requests, it becomes apparent that additional information may be relevant to the agency's review. None of these options are optimal and none advance the goal of assisting the agency in making informed decisions that will protect the public health and environment while facilitating necessary and legitimate projects.

A limit on the number of NODs may be something that could serve a useful purpose under certain circumstances, such as discouraging haphazard filings. But when the agency and the applicant engage in documented, ongoing, good faith efforts to exchange relevant information, such a working relationship between the agency and the applicant should be encouraged rather than stifled by an arbitrary

limit on requests for information. An operating procedure designed to discourage ill-advised filings should not be transformed into a sword to kill off more complicated, nuanced, and sophisticated applications on the ground that, despite the good faith of all parties, an agency determines it would be in the public's interest if it were to review more information before making a decision.

In short, the TCEQ's discretion in issuing more than two requests for additional information regarding Pintail's facility (captioned as NODs or otherwise) was not constrained by any legally binding limitation. The process used to approve Pintail's registration application does not demonstrate an abuse of discretion.

## CONCLUSION

Appellants have not made any showing as required under the standard for review in the provision they invoke as the basis for this appeal, Health and Safety Code section 361.321(e). Specifically, they make no showing that the TCEQ's actions were invalid, arbitrary, or unreasonable. Nor have Appellants shown that the TCEQ violated any statutory or regulatory requirements, or otherwise abused its discretion. Instead, the record demonstrates a reasonable basis supporting the TCEQ's actions. Under these circumstances, the district court did not err in affirming the TCEQ's approval of Pintail's registration.

## PRAYER FOR RELIEF

Wherefore, premises considered, Pintail Landfill, LLC respectfully prays that this Court affirm the judgment of the district court in all respects.

Respectfully submitted,

*/s/ Michael S. Truesdale*
Michael S. Truesdale

LAW OFFICE OF MICHAEL S. TRUESDALE, PLLC
State Bar No. 00791825
801 West Avenue, Suite 201
Austin, TX 78701
512-482-8671
866-847-8719 (fax)
mike@truesdalelaw.com

MCELROY, SULLIVAN, MILLER, WEBER & OLMSTEAD, L.L.P.
Brent W. Ryan
State Bar No. 17469475
P.O. Box 12127
Austin, TX 78711
512-327-8111
512-327-6566 (fax)
bryan@msmtx.com
COUNSEL FOR APPELLEE
PINTAIL LANDFILL, LLC

**CERTIFICATE OF SERVICE**

On March 27, 2015, the undersigned certifies that he served a copy of this Brief of Appellants on the following in the manner listed below, in compliance with Texas Rules of Appellate Procedure 9.5 and 25.1(e):

| | |
|---|---|
| V. Blaire Peña | Monica M. Jacobs |
| Terry L. Scarborough | Diana L. Nichols |
| Michael L. Woodward | Shana L. Horton |
| Hance Scarborough, LLP | Kelly Hart & Hallman LLP |
| 400 West 15th Street, Suite 9500 | 301 Congress Avenue, Suite 2000 |
| Austin, TX 78701 | Austin, Texas 78701 |
| **Attorneys for Citizens Against the Landfill in Hempstead** | **Attorneys for City of Hempstead** |

Ken Paxton, Attorney General of Texas
Charles E. Roy, First Assistant Attorney General
James E. Davis, Deputy Attorney General for Civil Litigation
Jon Nierman, Chief Environmental Protection Division
Nancy Olinger, Assistant Attorney General
Cynthia Woelk, Assistant Attorney General
Daniel C.Wiseman, Assistant Attorney General
P.O. Box 12548, Capitol Station (MC-066)
Austin, TX 78711-2548
**Attorneys for the Texas Commission on Environmental Quality**

*/s/ Michael S. Truesdale*
Michael S. Truesdale

**CERTIFICATE OF COMPLIANCE**

The undersigned certifies that this brief complies with the word limitation contained in Texas Rule of Appellate Procedure 9.4(i)(2)(E) in that the brief contains a total of 8,761 words, excluding parts of the brief exempted by Tex. R. App. P. 9.4(i)(1), as calculated by the word count tool of Microsoft Word (2008) for Mac.

*/s/ Michael S. Truesdale*
Michael S. Truesdale